UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GUY V. WALKER, JR.,

    Plaintiff,

v.

IVERSON, ET AL.,

    Defendants.
_____/

Case No. 10-10428

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING DEFENDANT IVERSON'S MOTION FOR SUMMARY JUDGMENT [35]**

    This litigation arises out of an altercation at a Detroit nightclub on April 11, 2009. Plaintiff alleges that he suffered physical and emotional injuries when Defendant Antwaun Clisby punched him in the left eye.[1] Plaintiff admits that Defendant Iverson did not threaten, touch, or physically harm him. Rather, Plaintiff's state-law tort claims – assault and battery, intentional infliction of emotional distress,[2] negligent supervision and civil conspiracy – are based on his allegations that Defendant Clisby was acting as Defendant Iverson's agent when he assaulted him and that Clisby and Iverson conspired to commit an assault and battery on Plaintiff on April 11, 2009. The Court has diversity jurisdiction over this matter.

---

[1] As Defendant Iverson points out, Mr. Clisby's name is misspelled in the pleadings as "Clisey."

[2] Plaintiff concedes in his response that "the tort of negligent infliction of emotional distress is only recognized in Michigan in certain circumstances, which are not applicable here," and abandons that claim. (Resp. at 12, n.1.)

This matter comes before the Court on Defendant Iverson's motion for summary judgment. Defendant's motion is GRANTED. There is no evidence that Defendant Iverson assaulted or battered Plaintiff, that Defendant Clisby was acting as his employee or agent at the time he assaulted Plaintiff, or that Defendant Iverson conspired with Defendant Clisby to commit an assault and battery on Plaintiff.

**I.   Facts**

On the evening of April 11, 2009, Defendant Iverson, a professional basketball player, employed the current Detroit Police Chief, Ralph Godbee Jr., and another off-duty police officer, Jose Hardrick, to provide security services for him while he was at a Detroit nightclub, South Beach Pizza Bar. Two friends went to the nightclub with Iverson, Defendant Clisby and Leon Maynard. Defendant Clisby accompanied Defendant Iverson at the nightclub as a friend, not as part of Godbee's security team. (Godbee Aff. at ¶¶ 2-6, 9-12.) Defendants Clisby and Iverson have been friends since 1993 or 1994, and Clisby has never been an Iverson employee. (Clisby Dep. at 7, 23-24, 42, 44.) Defendants Clisby and Iverson went to a VIP section, others joined them, and Iverson paid the bar tab for all who joined him in his VIP section. (*Id.* at 48.)

The hired security staff – Godbee and Hardrick – stayed close to Defendant Iverson while he was at the South Beach nightclub. At some point late in the evening of April 11, 2009 or the early morning hours, a fight erupted in a distant section of the bar, far from the roped-off VIP section where Godbee and Hardrick were standing or seated next to Defendant Iverson. (Godbee Aff. at ¶¶ 6-7.) Godbee and Hardrick immediately took action to remove Defendant Iverson from the premises to the safety of the parking lot and a waiting vehicle. Although Hardrick was temporarily separated from Defendant Iverson,

Godbee was with Iverson the entire time. Godbee avers that Defendant Iverson was not involved, in any way, in the fight that erupted in the bar. Godbee further avers that, because the bar fight occurred in a distant section of the nightclub, Defendant Iverson was not in a position to direct anybody to do anything in connection with this fight. Moreover, it was only later when Defendant Clisby came to the car in the parking lot that Godbee discovered that Clisby was involved in the bar fight. (Godbee Aff. ¶¶ 7-11.)

Plaintiff was at the South Beach nightclub as well on April 11, 2009. He was there with his then fiance (now wife), Charrise Walker, for a birthday celebration for her twin brothers, Omar and Shimar Mitchell. Other family and friends were also present for the celebration, and all were seated in a VIP section arranged through Omar Mitchell (the "Walker VIP section").

In her affidavit, Plaintiff's wife attests to going over to Defendant Iverson's VIP section and, after taking one photograph of Iverson, attempted to take another but did not do so after Defendant Clisby indicated that Iverson did not want to be photographed.

> In another area of the VIP section was a group that included Allen Iverson. Because my daughter is a huge fan of Mr. Iverson, I attempted to get his photograph. When I attempted to photograph him, he was seated on the back portion of the couch with his feet on the seat cushion. Seated next to him was an individual that I later learned was Atwuan Clisey [sic]. After taking the photograph, I realized that Mr. Iverson's head was turned. Therefore, I was in the process of taking another photograph when I noticed that Mr. Clisey [sic] was gesturing no. At that point, I lowered the camera and asked if he was telling me that Mr. Iverson did not want to be photographed. He indicated that Mr. Iverson did not want to be photographed and I apologized and placed my camera back in my purse.

(Charrise Walker Aff., ¶ 2.)

Another individual who was in the same VIP section as Charrise Walker, Ronnie Peter, attests to what occurred before the bar fight. While in the Walker VIP section, Mr.

3

Peter observed Mr. Iverson in the Iverson VIP section "flashing two giant stacks of money" around. Peter "locked eyes" with Iverson for a few moments and then shook his head and mouthed how stupid that conduct was. (Peter Aff., ¶ 2.)

> At that point, Mr. Iverson started jawing at me and I jawed back at him even though I could not hear what he was saying and he could not hear what I was saying due to the noise in the Club, I could tell he was cursing me. Mr. Iverson then began to talk to his bodyguards and point at me or in my direction. I walked away at that point and the man that Mr. Iverson had been talking to while he was pointing at me or in my direction, approached Guy Walker who was in the same area where I had left and struck him in the area of his left eye.

(*Id.*)

Almost identical affidavits are submitted by other individuals who were in the Walker VIP section of the nightclub. The aunt of Charisse and her twin brothers, Michelle Goins, attested to how Iverson whispered something in Defendant Clisby's ear immediately before he came over to Plaintiff and hit him on the left side of his face.

> While I was standing in our booth, I observed Mr. Iverson sitting in the VIP area talking to a young female and a man who appeared to be one of his bodyguards. When he was speaking to the man, who I later learned was Antwuan Clisby, he appeared to be pointing at someone in our booth. At that point, I did not pay much attention and did not think much of it, so I turned my back to them momentarily. When I looked back a few moments later, Mr. Clisby had approached the area where my niece, Charisse Walker and Guy Walker were standing. It then appeared that Charisse had some conversation with Mr. Clisby and then out of the blue, Mr. Clisby hit Guy Walker on the left side of his face with what I initially thought was a bottle but in fact were more likely brass knuckles.

(Goins Aff., ¶ 2.) Another of the twins' sisters, Patricia Boatwright, similarly attested that:

> While I was standing in our booth, I observed Mr. Iverson summon over a man who appeared to be one of his bodyguards. When the man, . . . , who I later learned was Antwuan Clisby, got close to Mr. Iverson, Mr. Iverson leaned over and whispered something in his ear as he pointed in my direction and that of the others in our booth. Mr. Clisby then walked over to where Guy Walker and my sister Charisse, were standing and asked Guy Walker "what the fuck is the problem." Prior to that time, I had not seen Mr. Clisby and Guy Walker interact

in any respect. At that point, Charisse was standing between Guy Walker and Mr. Clisby and was telling Mr. Clisby that there was no problem. I then observed Mr. Clisby swing at Guy Walker. It appeared that Mr. Clisby had something in his hand when he swung. I did not see the actual blow, but after Mr. Clisby swung, I did observe Guy Walker slump down as if he were falling, and I saw him bleeding profusely from the facial area and blood was all over his clothes.

(P. Boatwright Aff., ¶ 2.) A virtually identical affidavit was submitted by Demond Boatwright, Ms. Boatwright's then-fiance. The only new information provided in Demond's affidavit is that he observed Mr. Clisby strike Plaintiff two or three times in the face, that Demond immediately jumped into the situation to push Mr. Clisby off of Plaintiff but Clisby then attacked Demond and they fell to the floor at which time the club security separated them. (D. Boatwright Aff., ¶ 2.)

At his deposition, Plaintiff testified about his interactions with Defendant Iverson and his party in their VIP section prior to his altercation with Defendant Clisby. The first encounter was when people from the Walker party took pictures of Iverson and his party. Later, Plaintiff attempted to gain entry to Iverson's VIP section and accuse him of disrespecting his wife, but Iverson's security detail stopped him before he could get into Iverson's section.

- A. Prior to the incident, I walked over there because he was calling my wife a bitch. So, my intent was to go and say hey, we're not disrespecting you, don't disrespect us. The guy at the front, his security guard, just stuck his arm out, saying no, you can't pass beyond here. Then my wife came over and said hey, we don't need to go here, we're getting to go. We came back to our location, and that was the only time I went over that way, or actually over that way because I went to the restroom it was over there as well.

- Q. You're saying just out of the blue Mr. Iverson started referring to your wife as a bitch?

- A. He was holding up two big pieces of money. My wife was like, oh, forget him, everybody is like look at what he's doing, whatever. My wife was

> like, oh, forget him. And then his reply back was no, F U bitch. And he just kept saying F U bitch, F U bitch. Because it was like every time I looked that way that's what he was saying, no, F U bitch. So then I went over there and say, hey, we're not disrespecting you, don't disrespect us. His security detail stops me before I could even get into their section. So then that's when she came and got me, I came back.

(Pl.'s Dep. at 42.)

After that second encounter, Plaintiff returned to the Walker VIP section. Some time later, Defendant Clisby was standing next to Plaintiff. After Clisby asked Plaintiff if there was a problem, Plaintiff replied back to him "did [Alan Iverson] send you over here," and Clisby said "yes, is there a problem." Plaintiff replied to Clisby, "well, then, [Alan Iverson] is a little bitch." Plaintiff called Iverson that because "he sent someone else over there on his behalf. If he thought there was a problem why couldn't he talk to me." (Pl.'s Dep. at 51.) After Plaintiff referred to Iverson as "a little bitch," Clisby repeated his words, and Plaintiff replied by saying he agreed with what Clisby had repeated. (Pl.'s Dep. at 52-53.) After this exchange, Plaintiff's wife Charisse told Clisby that Plaintiff was not from here (meaning the Detroit area), said they were getting ready to go, and did not want any trouble. (Pl.'s Dep. at 53.) Plaintiff looked at his wife as she was telling him to go. Then, he was punched in the eye, felt tremendous pain, and could not see anything. (*Id.*) Plaintiff testified that there was a single punch, that he never tried to punch or push Clisby, and in fact was facing his wife, not Clisby, the whole time. (Pl.'s Dep. at 54.) Plaintiff, who was hurt and bloody, left the nightclub and was taken to the hospital. (*Id.*)

Plaintiff subsequently filed this lawsuit against Defendants Iverson and Clisby.

**II. Summary Judgment Standard**

6

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party may meet that burden "by 'showing' – that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Revised Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). The revised Rule also provides the consequences of failing to properly support or address a fact:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or
>
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

7

When the moving party has met its burden under rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike County Bd. Of Education*, 286 F.3d 366, 370 (6th Cir. 2002).

### III. Analysis

#### A. Intentional Torts

Plaintiff alleges that Defendant Iverson is directly liable for assault and battery and intentional infliction of emotional distress. He also alleges that Iverson is vicariously liable, through his ostensible agent Defendant Clisby, for Clisby's assault and battery and intentional infliction of emotional distress on Plaintiff. The Court first addresses the direct liability claims.

Plaintiff's claims of direct liability against Defendant Iverson are dismissed. Plaintiff presents no evidence to support these claims. He concedes this in his response when he argues that "the issue in this case is not whether or not Mr. Iverson himself touched or harmed anyone, rather, the question is [whether] Mr. Iverson cause[d] harm to the plaintiff through an agent." (Pl.'s Resp. at 1.)

Plaintiff's claims of vicarious liability against Defendant Iverson also fail. In his response, Plaintiff abandons any argument that his vicarious liability claims are based on Defendant Clisby being Iverson's employee. (Pl.'s Resp. at 1.) Rather, Plaintiff argues that

Defendant Iverson can be held vicariously liable for the intentional torts committed by Defendant Clisby because Clisby was acting as Iverson's agent at the time they were committed. In support, Plaintiff relies on witness affidavits attesting that Plaintiff was assaulted by Clisby shortly after Iverson was observed whispering in his ear and was observed pointing in the direction of the Walker VIP section. Plaintiff also relies on his deposition testimony that Clisby admitted to him that Iverson sent him over to Plaintiff to find out whether the Walker VIP party had a problem with Iverson. Defendant responds that (1) other than conjecture, speculation, unsupported opinion, and inadmissible hearsay, Plaintiff cannot support his claim that Clisby was acting as Iverson's agent when he assaulted him; and (2) even if Plaintiff could establish an agency relationship, Plaintiff has not presented evidence that would allow Iverson to be held vicariously liable for the intentional torts committed by his ostensible agent Clisby. The Court agrees with Defendant Iverson.

The Michigan Court of Appeals recently addressed whether a principal can be held vicariously liable for the intentional torts of its ostensible agent. In *Doe v. Shapiro*, Nos. 273950 and 273962, 2008 WL 583556 (Mich. Ct. App. March 4, 2008), the court rejected the plaintiff's arguments that the defendant doctor could be held vicariously liable for the intentional tort committed by an independent contractor he had hired to assist with the plaintiff's surgery. The independent contractor, a nurse anesthetist, sexually assaulted the plaintiff as she began to come out of the effects of anesthesia after her surgery. *Id.* at *1.

The court began its analysis by describing how an ostensible agency is created. "An ostensible agency may be created when the principal intentionally or by want of ordinary

9

care, causes a third person to believe another to be his agent who is not really employed by him." *Id.* at *8 (internal quotation marks and citations omitted.) The *Doe* court then concluded that "even if [the plaintiff] could successfully establish the elements of an ostensible agency in an attempt to fix liability on [the defendant] for [the agent]'s alleged intentional acts," this argument "fails because Michigan law does not subscribe to a theory of creating vicarious liability in a principal for the commission of an unknown criminal act by an agent aided in that act through the agency relationship." *Id.* (citing *Zsigo v. Hurley Med. Ctr.*, 475 Mich. 215, 231, 716 N.W.2d 220 (2006)). The *Doe* court found additional support for "the rule exempting vicarious liability in the principal for the unknown criminal acts of its agent" in a recent Michigan Supreme Court decision, *Brown v. Brown*, 478 Mich. 545, 566, 739 N.W.2d 313 (2007). *Doe*, 2008 WL 583556 at *9.

"In *Brown*, the plaintiff worked the night shift as a security guard in a plant" and had "complained to her employer at least three times" that a co-worker "routinely made sexually explicit and offensive comments" to her "that made her uncomfortable." *Doe*, 2008 WL 583556, at *9 (internal quotation marks and citation omitted). Plaintiff's complaints went unheeded, and she was ultimately raped. Plaintiff sued her employer alleging claims of negligence and vicarious liability for the co-worker's assault and battery. The trial court granted the employer's motion for summary judgment. The plaintiff then successfully appealed to the Michigan Court of Appeals. That court held that "an employer may share liability for intentional torts committed by an employee who is acting beyond the scope of employment if the employer knew, or should have known, of the employee's violent propensities." *Id.* (internal quotation marks and citation omitted). The employer appealed

that decision, and the Michigan Supreme Court reversed, holding that "the defendant employer was not vicariously liable for [its employee]'s actions because defendant could not reasonably have anticipated that [the employee]'s vulgarities would culminate in rape." *Id.* (internal quotation marks and citation omitted). Even though "the defendant employer . . . was aware of a high level of unwanted sexual advances and a propensity for vulgar and offensive sexually based speech" made by its employee to the plaintiff co-worker, the Michigan Supreme Court "found [in *Brown*] that the defendant employer's knowledge was not enough to make [its employee]'s criminal act foreseeable." *Id.*

Relying on the analysis and holding in *Brown*, the *Doe* court reached a similar result. Because the plaintiff in *Doe* presented no evidence showing that the doctor who hired the nurse anesthetist "had any knowledge whatsoever that [the nurse anesthetist] had the propensity to commit sexual assault," the plaintiff's "argument that liability is created by virtue of an ostensible agency relationship fails." *Id.* The same reasoning and result apply here. Because Plaintiff presents no admissible evidence that Iverson agreed that Clisby would commit an assault and battery on Plaintiff, directed Clisby to do so, or had any knowledge whatsoever that Clisby had the propensity to commit an assault and battery on Plaintiff, his argument that liability is created by virtue of an ostensible agency relationship similarly fails.

### B. Civil Conspiracy Claim

Plaintiff also alleges that Defendants Iverson and Clisby conspired to accomplish a criminal purpose, i.e., have Clisby commit an assault and battery on Plaintiff. "Michigan conspiracy law provides that a conspiracy is a combination of two or more persons, by

some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a purpose not unlawful by criminal or unlawful means." *Hamilton v. City of Romulus*, 409 F. App'x 826, 836 (6th Cir. 2010). Plaintiff points to the same affidavits and deposition testimony referenced above and argues that it is reasonable to infer from a whisper and a point in his general direction that Defendants agreed that Clisby would commit an assault and battery on him. Plaintiff is mistaken. At best, the affidavits and deposition testimony support a conclusion that Defendants agreed that Clisby would go over to Plaintiff and ask him whether his party had a problem with Iverson. There is no evidence that gives rise to a reasonable inference that Defendants agreed that Clisby would commit an assault and battery on Plaintiff. Speculation and conjecture do not give rise to a reasonable inference. *See Yoost v. Caspari*, ___ N.W.2d ___, 2011 WL 4104505, *9 (Mich. Ct. App. Sept. 15, 2011) (quoting *Skinner v. Square D Co.*, 445 Mich. 153, 164; 516 N.W.2d 475 (1994) ("To be adequate, a plaintiff's circumstantial proof must facilitate reasonable inferences . . . not mere speculation.")). Plaintiff's civil conspiracy claim is dismissed.

### C. Negligent Hiring, Training, Supervision Claim

Defendant Iverson argues that Plaintiff's direct-liability claim alleging that he negligently hired, trained, or supervised Defendant Clisby should be dismissed because there is no evidence that Clisby was hired, trained, or supervised by him. Plaintiff concedes that, because there is no evidence that an employer/employee relationship existed between Defendants, there can be no claim for negligent hiring or training. Plaintiff does, however, argue that he can maintain a claim that an agency relationship existed between Defendants, that this relationship obligated Iverson to supervise Clisby in a reasonable

manner, that Iverson failed to do so, and that Iverson's negligence caused Plaintiff's injuries. Despite this argument, Plaintiff presents no evidence showing that Clisby was present at the nightclub in any capacity other than Iverson's guest. Plaintiff fails to present evidence showing that Iverson owed Plaintiff a duty to supervise Clisby's conduct at the nightclub. Accordingly, Plaintiff's claim of negligent supervision alleged against Defendant Iverson is dismissed.

### IV. Conclusion

For the above-stated reasons, Defendant Iverson's motion for summary judgment is granted. Plaintiff's claims asserted against Defendant Iverson are dismissed with prejudice.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: November 15, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on November 15, 2011, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager